Eastern District of Kentucky
**FILED**

DEC 9 - 2005

AT COVINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON**

CIVIL ACTION NO. 04-37 (WOB)

BUYER'S CORNER REALTY, INC.                    **PLAINTIFF**

VS.                    <u>**MEMORANDUM OPINION AND ORDER**</u>

NORTHERN KENTUCKY ASS'N
OF REALTORS, ET AL                    **DEFENDANTS**


   This is an antitrust action brought pursuant to section 1 of
the Sherman Antitrust Act, 15 U.S.C. § 1, and sections 4 and 16
of the Clayton Act, 15 U.S.C. §§ 15 and 26.  The case is
currently before the court on cross motions for summary judgment.

   The court heard oral argument on these motions on Thursday,
December 1, 2005.  David Barry represented the plaintiffs, and
Jack Bierig, Julie Potter, and Joseph Baker represented the
defendants.  Also present was Cindy Dobias, Chief Executive
Officer of the defendant companies.  Official court reporter Joan
Averdick recorded the proceedings.

   Having heard the parties, the court now issues the following
opinion and order.

### *FACTS*

   Defendant Northern Kentucky Association of Realtors ("NKAR")
is a real estate professionals' trade association.  It offers
services to its members including training, technology services,
computer classes, comparative data, legislative monitoring, and

publications.  As a condition of membership, NKAR requires
members to join the Kentucky Association of Realtors ("KAR") and
the National Association of Realtors ("NAR").  Those entities
offer services in addition to the services provided by the NKAR.

In 2004, the annual membership fees for the NKAR, the KAR,
and the NAR were $162, $98, and $84, respectively, for a total of
$344.  Upon payment of this amount to the NKAR, a realty agent
becomes a member of all three associations.  As of December 31,
2003, the NKAR had 1,055 members.

Defendant Northern Ky. Multiple Listing Service ("NKMLS") is
a wholly-owned subsidiary of the NKAR.  It is a non-profit
organization.  The NKMLS operates a computerized database of
homes for sale in Northern Kentucky that are listed with real
estate agents who are members of the NKAR.  The NKMLS is the only
multiple listing service in Northern Kentucky.  The monthly fee
for MLS services in 2004 was $35.00.

A real estate professional cannot purchase MLS services from
NKMLS unless he or she has joined a NAR Federation trade
association and is thereby authorized to use the Realtor®
trademark.[1]  However, real estate professionals do not have to
join the NKAR in order to purchase MLS services from the NKMLS;
they can join any NAR Realtor® association.  In 2003, the NKMLS

---

[1]The parties refer to this requirement as "the membership
rule."

2

gave access to its MLS to approximately 285 real estate brokers and agents who were members of associations of Realtors® other than the NKAR.

Membership in an association of Realtors® requires that a real estate licensee agree to subscribe to, and abide by, the Code of Ethics of the NAR. The Code contains a "non-solicitation" rule that, with respect to the MLS, allows listing brokers to place their listings on the MLS without the fear of losing those listings to other brokers who might otherwise solicit the seller. The Code also contains an arbitration clause that requires that members resolve their disputes through arbitration.

Also, NKAR members are free not to participate in the MLS. Of the 1,055 members that the NKAR had at the end of 2003, 22 did not purchase MLS services.

The NKMLS also operates a publicly-available website which offers much of the listing information contained in the database at no cost.

Fees for the NKAR are set by its Board of Directors, which consists of NKAR members who are elected by the association's general membership. Similarly, fees for the NKMLS are set by its Board of Directors, which consists of NKMLS participants and subscribers who are elected by NKMLS participants.

Plaintiff Buyer's Corner is a Kentucky corporation doing

3

business in Northern Kentucky whose principal, plaintiff Sherry Edwards, is a licensed real estate broker. Edwards has been a member of a local association of Realtors® for 24 years. She has been a member of the NKMLS for over 20 years. For the years 2001-2004, plaintiff paid $1,357 in trade association charges to the NKAR.

Edwards operates exclusively as a buyer's agent, that is, she never represents sellers or takes listings. She is also a member of the National Association of Exclusive Buyer Agents ("NAEBA"), an organization of real estate licensees who exclusively represent buyers. She believes that NAR and its affiliates are unethical because they permit real estate brokers to represent both the buyer and the seller in a single transaction. Edwards alleges that she has continued her membership in the NKAR solely to gain access to the NKMLS.

Edwards filed this action alleging that defendants' "membership rule" constitutes an unlawful tying arrangement and group boycott in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

4

### *ANALYSIS*

#### A.   **Tying Claim**

Section 1 of the Sherman Act states, in part:

> Every contract, combination in the form of trust or
> otherwise, in restraint of trade or commerce among the
> several states is declared illegal.

15 U.S.C. § 1.[2]  Although the literal language of this statute

prohibits every agreement in restraint of trade, the "Supreme

Court has long recognized that Congress intended to outlaw only

'unreasonable' restraints." *In re Cardizem CD Antitrust*

*Litigation*, 332 F.3d 896, 906 (6th Cir. 2003) (citation omitted),

*cert. denied*, 125 S. Ct. 307 (2004).

"Tying" arrangements are one type of restraint that may run

afoul of the antitrust laws.  As the Supreme Court has explained,

a "tying" arrangement is "an agreement by a party to sell one

product but only on the condition that the buyer also purchase a

different (or tied) product, or at least agrees that he will not

purchase that product from any other supplier." *Eastman Kodak v.*

*Image Technical Services, Inc.*, 504 U.S. 451, 461 (1992)

(citation omitted).  *See also Jefferson Parish Hospital District*

*No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("Our cases have concluded

---

[2]Private persons are given a cause of action under the
Sherman Act by section 4 of the Clayton Act, which provides for a
suit to recover treble damages by any person injured in his
business or property by the violation of the antitrust laws.
Section 16 of the Clayton Act allows injured parties to sue for
injunctive relief.

that the essential characteristic of an invalid tying arrangement
lies in the seller's exploitation of its control over the tying
product to force the buyer into the purchase of a tied product
that the buyer either did not want at all, or might have
preferred to purchase elsewhere on different terms.").

A tying arrangement is a violation of antitrust law only if
a "substantial volume of commerce is <u>foreclosed</u> thereby."
*Jefferson Parish*, 466 U.S. at 16 (emphasis added).  This is
because the primary concern about such arrangements is that they
may allow a seller to exploit its power in the market for the
tying product to invade, and then stifle competition in, the
market for the tied product.  *Id.* at 14-16.

Thus, the Supreme Court noted in *Jefferson Parish* that where
the buyer would not have purchased the tied product from another
seller, such foreclosure is not present:

> Similarly, when a purchaser is "forced" to buy a product he
> would not have otherwise bought even from another seller in
> the tied product market, there can be no adverse impact on
> competition because no portion of the market which would
> otherwise have been available to other sellers has been
> foreclosed.

*Id.* at 16.

The Sixth Circuit has formulated the elements of a tying
claim as follows:

> A plaintiff may bring a private antitrust action based on an
> illegal tying arrangement under §1 of the Sherman Act if he
> can allege that: (1) the seller has "'appreciable economic
> power' in the tying product market"; and (2) "the
> arrangement affects a substantial volume of commerce in the

6

tied market." . . .  We have also required that a plaintiff
allege: (1) the seller of the tying product has a direct
economic interest in the sale of the tied product, *Beard v.
Parkview Hosp.*, 912 F.2d 138, 139, 142-44 (6th Cir. 1990);
and (2) the plaintiff has suffered antitrust injury as a
result of the tying arrangement, *Valley Prods. Co. v.
Landmark, a Div. of Hospitality Franchise Sys., Inc.*, 128
F.3d 398, 402-03 (6th Cir. 1997).

*CTUnify, Inc. v. Nortel Networks, Inc.*, 115 Fed. Appx. 831, 834

(6th Cir. 2004).

### 1.   Antitrust Injury and Standing

The requirement that an antitrust plaintiff be able to prove

that he or she has suffered "antitrust injury" is treated as a

threshold issue of standing:

> [I]t is appropriate to turn first to the issue of antitrust
> standing before weighing the issues of relevant market,
> market share, etc.  <u>In other words, before discussing the
> claims made in this case regarding relevant market and
> market power we must determine if [the plaintiff] has
> antitrust standing to assert claims under the Supreme
> Court's precedents.</u>

*HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 874, 876-77

(6th Cir. 1991) (emphasis added), *cert. denied*, 503 U.S. 938

(1992).

In *HyPoint*, the Sixth Circuit emphasized the importance of

the standing inquiry:

> Antitrust standing to sue is at the center of all antitrust
> law and policy.  It is not a mere technicality.  It is the
> glue that cements each suit with the purposes of the
> antitrust laws, and prevents abuses of those laws.  The
> requirement of antitrust standing ensures that antitrust
> litigants use the laws to prevent anticompetitive action and
> makes certain that they will not be able to recover under
> the antitrust laws when the action challenged would tend to
> promote competition in the economic sense.  Antitrust laws

7

reflect considered policies regulating economic matters. The antitrust standing requirement makes certain that the laws are used only to deal with the economic problems whose solutions these policies were intended to effect.

*Id.* at 877.

The standing requirement is so important that, even where a court concludes that an unlawful tying arrangement likely exists, it will still inquire whether the plaintiff before the court has itself suffered antitrust injury flowing from that unlawful arrangement. *See In re Cardizem CD Antitrust Litigation*, 332 F.3d 896, 909 n. 15 (6th Cir. 2003) ("Our conclusion that the Agreement was a *per se* illegal restraint of trade does not obviate the need to decide whether the plaintiffs adequately alleged antitrust injury.").

Standing to bring an action under section 1 of the Sherman Act is conferred by section 4 of the Clayton Act, which provides, in pertinent part:

> Any person <u>who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor</u> . . ., and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15 (emphasis added).

In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977), the Supreme Court held that this statutory language requires more than mere injury proximately caused by a violation of the antitrust laws. Instead,

Plaintiffs must prove <u>antitrust injury</u>, which is to say

8

injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.  <u>The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.</u>

*Id.* at 489 (emphasis added).

Thus, the "antitrust injury element of standing ensures that a plaintiff can recover only for those losses that stem from the competition-reducing aspects of defendant's behavior." *Worldwide Basketball and Sport Tours, Inc. v. National Collegiate Athletic Ass'n*, 388 F.3d 955, 965 (6th Cir. 2004) (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990)) (Gibbons, J., concurring), *cert. denied*, 126 S. Ct. 334 (2005).  *See also Care Heating & Cooling, Inc. v. American Standard, Inc.*, 427 F.3d. 1008, 1014 (6th Cir. 2005) ("Individual injury, without accompanying market-wide injury, does not fall within the protections of the Sherman Act.").

Antitrust plaintiffs do not suffer antitrust injury merely because they are in a worse position than they would have been had the challenged conduct not occurred.  *See Brunswick*, 429 U.S. at 486-87.  Consequently, "[d]amages do not constitute 'antitrust injury' unless 'attributable to an anti-competitive aspect of the practice under scrutiny.'" *HyPoint*, 949 F.2d at 878 (citation omitted).  *See also Campus Center Discount Den, Inc. v. Miami Univ.*, No. 96-4002, 1997 WL 271742, at *1 (6th Cir. May 21, 1997) ("If a plaintiff fails to show anticompetitive conduct, that

9

party lacks standing to bring the antitrust action."); *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 88 (6th Cir. 1989) (noting that Supreme Court opinions on antitrust standing "have been read as teaching that the antitrust plaintiff must show (1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions") (internal quotations and citation omitted).

Viewing the facts and drawing inferences most favorable to plaintiffs, the court concludes that they lack antitrust standing as a matter of law. Although plaintiffs assert standing on the basis that they were forced to purchase an unwanted product - - membership in a local Realtor® association -- such "harm" does not constitute "antitrust injury" necessary for standing.

In *Jefferson Parish*, the Supreme Court was careful to point out that no antitrust claim would lie just because the plaintiff was "forced" to purchase an unwanted product if, absent the tie, he would not have bought it elsewhere. *Jefferson Parish*, 466 U.S. at 16. This is because, in such a situation, no sales in the tied product market were foreclosed on account of the tie, and thus there has been no harm to competition. *Id.* The plaintiff merely ends up with a product he did not want.

As Professor Areeda explains in his oft-quoted treatise,

10

> To be sure, the particular funds paying for the tied product
> might otherwise have been spent for some other purpose,
> ranging from banking it to buying another product or a night
> on the town. While depleting a bank account or foregoing
> some purchase in a different market might be said to
> "foreclose" sellers of banking services or sellers in other
> markets, that type of "foreclosure" does not differ in kind
> or degree from paying a higher price for the tying product,
> to which tying law is indifferent.

Phillip E. Areeda, *Antitrust Law*, § 1723a, at 297 (1991). *See
also Young v. Lehigh Corp.*, No. 80C4376, 1989 WL 117960, at *15
(N.D. Ill. Sept. 28, 1989) ("Although the plaintiff may have
suffered an 'injury' in paying for club membership that he did
not need or want, he did not suffer an 'antitrust injury' and,
therefore, does not have standing to assert an antitrust tying
claim.").

Thus, while plaintiffs may not have wanted to purchase a
Realtor® membership, in order to bring this antitrust claim they
must show that they have suffered an injury caused by some
anticompetitive harm or effect flowing from that requirement.
This they have not done.

Plaintiffs fail to explain how they have been harmed by any
restrained competition in the tied product market. The only
other association that plaintiff Sherry Edwards desires to join
is the National Association of Exclusive Buyer Agents ("NAEBA"),
and it is undisputed that she indeed is a member of that

association.[3]  Thus, the requirement that she belong to a local

Realtor® association, and the cost thereof, has not prevented

Edwards from joining another, non-NAR, association of her

choice.[4]

Plaintiffs' heavy reliance on *Thompson v. Metropolitan*

*Multi-List, Inc.*, 934 F.2d 1566 (11th Cir. 1991), *cert. denied*,

506 U.S. 903 (1992), is thus misplaced.  There, one of the

plaintiffs was the Empire Real Estate Board, an African-American

professional association founded in 1939 as an alternative to the

---

[3]There are eight other associations that plaintiffs claim
are "competitors" of local Realtor® associations.  These are
discussed below in regard to the market foreclosure issue.
However, Edwards does not claim that but for the tie at issue
here she would join any of these other groups.

[4]In his treatise, Professor Areeda explains that there is no
cognizable anticompetitive effect where the buyer proceeds in
defiance of an attempted restraint and purchases a competing
product:

> For example, dealers required to stock a manufacturer's full
> line would not be foreclosed to rival sellers at all if they
> would not stock a second brand in any event <u>or only
> minimally if they stock other brands anyway.</u>

Phillip E. Areeda, *Antitrust Law*, § 1769e1, at 440 n. 48 (1996)
(emphasis added).

For this reason, plaintiffs' citation to *Barber & Ross Co.
v. Lifetime Doors, Inc.*, 810 F.2d 1276 (4th Cir.), *cert. denied*
484 U.S. 823 (1987), is inapposite.  There, the plaintiff was
foreclosed, by virtue of defendant's tying arrangement, from
purchasing certain products from other suppliers that it
otherwise would have purchased.  *Id.* at 1279 n. 1.  Here, Edwards
wished to join, and did join, another association,
notwithstanding the requirement that she join a Realtors®
association.  She thus has not been harmed by any such
anticompetitive effect.

12

NAR local affiliate in Atlanta, which did not then admit black members. The court found that the Empire Board had standing to litigate the MLS tying claim because the evidence showed that Empire competed with the Realtors® association for members, and that the association had lost members who dropped their Empire memberships in favor of joining the local Realtors® association so that they could gain access to the MLS. *Id.* at 1571.[5]

Here, no competing association has come forward to complain that it has lost members on account of the tie at issue, nor has any other real estate professional come forward alleging that he or she would have joined a competing association but for the NKMLS's requirement that they join a NAR affiliate in order to gain access to the NKMLS.[6]

Therefore, because plaintiffs have shown no antitrust injury as a matter of law, they lack standing to bring the tying claim.

2.   **Zero Foreclosure**

Closely related to the concept of antitrust injury is the

---

[5]An individual real estate agent was also a plaintiff and also found to have standing. However, the First Circuit based its conclusion that he had standing on the fact that he had been denied access to the MLS and had suffered injury to his business as a result. *Id.* at 1572. Here, Edwards has never been denied access to the NKMLS and thus can show no comparable injury.

[6]Again, it is important to note that the NKMLS does <u>not</u> require that its participants join the NKAR in order to gain access to the MLS. Rather, membership in <u>any</u> local association of Realtors® will suffice. As previously noted, in 2003, NKMLS gave access to its MLS to 285 real estate brokers who belonged to Realtors® associations <u>other than</u> the NKAR.

13

concept of "zero foreclosure": that is, where there are no other sellers of the tied product, no sales are foreclosed by the tie and thus competition is not harmed. *See* Phillip E. Areeda, *Antitrust Law*, § 1723a, at 296 (1991) ("When there are no rival sellers of the tied product to be foreclosed, then the alleged tie-in might affect a substantial volume of commerce in the tied product and yet not foreclose anyone.").

In an effort to demonstrate foreclosure, plaintiffs claim that eight other associations compete with Realtor® associations: the Massachusetts Association of Buyer Agents ("MABA"); the National Association of Exclusive Buyer Agents ("NAEBA"); the Asian Real Estate Agent Association ("AREAA"); the National Association of Real Estate Brokers ("NAREB"); the National Association of Real Estate Appraisers ("NAREA"); and the Appraisal Institute ("AI"). This argument fails for several reasons.

First, as another district court recently concluded in a nearly identical case, these entities are not in the same product market as the Realtor® associations. In *Reifert v. South Cental Wisconsin MLS Corp.*, No. 04-C969-S, 2005 WL 2055958 (W.D. Wisc. Aug. 25, 2005), the court considered cross-motions for summary judgment involving an identical challenge to a local MLS.

The plaintiff in *Reifert* also argued that these eight entities were "competitors" of the Realtor® defendants. The

14

court found, however, that the undisputed facts showed that none of these entities served the same market as defendants:

> While it is true that there is superficial overlap in the offerings of these associations -- conventions, websites, education, publications, lobbying -- these similarities do little to establish that any are competing in the same product market with Realtors. Virtually all professional organizations offer such services while undoubtedly serving different product markets.
>
> Services are in the same market when they are good substitutes for one another. That is, when there is "interchangeability of use or the cross elasticity of demand between the product and the substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S. Ct. 1502, 8 L. Ed.2d 510 (1962). Furthermore, plaintiff bears the burden to prove by econometric evidence that the products are good substitutes. . . . "[O]bserving things that to the untutored eye seem to be substitutes need not mean that they *are* substitutes." . . . Not only has plaintiff failed to bring forth econometric evidence, its proffered competitive associations do not appear to be good substitutes even to the "untutored eye."

*Id.* (some citations omitted) (italics in original).

The court then examined each of the named associations. As to the NAEBA and MABA, it held that they both served exclusively buyer agents and that the latter served only agents in Massachusetts. They were thus unlikely to be substitutes for Realtor® associations in Wisconsin. *Id.* Moreover, the plaintiff had joined NAEBA "without regard" to his membership in Realtors®. *Id.*

As to the AI, NAIFA, and NAREA, the court held that they were dissimilar because they were devoted to providing services solely to real estate appraisers, and thus they were unlikely

15

substitutes for the far more general services provided by Realtor® associations. *Id.* at *5.

Finally, the AREAA and NAHREP were held not to be substitutes for Realtor® associations as a matter of law because they served only distinct ethnic communities, that is, Asian and Hispanic realtors. *Id.*

The court concluded:

> Not only do none of these associations appear to be good substitutes, <u>plaintiff has not offered evidence of a single real estate professional who has joined one of those organizations instead of Realtors or who has declined to join because he or she is a member of Realtors.</u> The lack of such evidence is in stark contrast to the evidence in *Thompson* that 400 brokers fell into those categories.

*Id.* (emphasis added).

The court's reasoning in *Reifert* applies here. First, the Sixth Circuit, like the Seventh Circuit, places the burden on antitrust plaintiffs "to define the relevant market within which the alleged anticompetitive effects of the defendant's actions occur." *Worldwide Basketball and Sport Tours, Inc. v. National Collegiate Athletic Ass'n*, 388 F.3d 955, 962 (6th Cir. 2004) (citation omitted), *cert. denied*, 126 S. Ct. 334 (2005). "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Id.*

Likewise, the Sixth Circuit applies a "reasonable interchangeability" standard for determining whether alleged competitors are in fact part of the same product market. *Id.* at

16

961. Such interchangeability must typically be demonstrated by a
"cross-elasticity" economic study. *Id.* at 962.

Plaintiffs' attempt to characterize these eight associations
as "competitors" to the NKAR is thus unavailing. Moreover, even
if they were competitors, plaintiffs have produced no evidence
that any real estate agent has declined to join them because of
their Realtor® membership. And, as already noted, Edwards --
just like the plaintiff in *Reifert* -- joined the NAEBA anyway,
notwithstanding her NKAR membership.

The First Circuit reached a similar result in the context of
an antitrust challenge to an MLS system in *Wells Real Estate,
Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803 (1st Cir.
1988), *cert. denied*, 488 U.S. 955 (1988). There, the plaintiff
Wells was a "traditional" realtor who preferred selling houses
listed exclusively with him but whose share of local sales fell
as more houses were listed through the local Realtor® Board's
MLS. He accused the Board of an unlawful tie by virtue of the
requirement that a real estate agent join the Board in order to
use the MLS. The First Circuit affirmed a directed verdict on
the tying claim, stating:

> Wells has failed to demonstrate the slightest market for
> membership in real estate boards that might have been
> affected by the defendants' alleged tying arrangement.
> There is no evidence that any other broker would have
> "purchased" membership in any other board but for the power
> exerted by the lure of the defendants' MLS. There is no
> evidence that a substantial volume of "commerce" in board
> membership was foreclosed by the tie-in. The tying claim

17

must fail absent any proof of anticompetitive effects in the
market for the tied product.

*Id.* at 815. *See also O'Riordan v. Long Island Bd. of Realtors*,
707 F. Supp. 111, 116 (E.D.N.Y. 1988) (granting summary judgment
for defendants on MLS tying claim because plaintiff failed to
show anticompetitive effect).

Therefore, plaintiffs have shown no foreclosure in the
market for the tied product, and their tying claim should thus be
dismissed. *See Jefferson Parish Hospital District No. 2 v. Hyde*,
466 U.S. 2, 31 (1984) ("Without a showing of actual adverse
effect on competition, respondent cannot make out a case under
the antitrust laws.").[7]

### B.   Group Boycott Claim[8]

A plaintiff alleging an unlawful group boycott under the
Sherman Act bears the burden of proving that the defendant's
actions may suppress or even destroy competition. *Foundation for
Interior Design Educ. Research v. Savannah College of Art &
Design*, 244 F.3d 521, 530 (6th Cir. 2001) (citation omitted).

As already discussed with respect to the tying claim,
plaintiffs cannot show that the NKMLS's requirement that

---

[7]Given that the lack of antitrust injury is fatal to
plaintiffs' claims, the court need not address defendants'
alternative, independent arguments for summary judgment.

[8]The standing analysis discussed above applies equally to
plaintiffs' boycott claim, that is, they lack standing to bring
such a claim because they have suffered no antitrust injury.

18

participants belong to a local Realtor® association has any
anticompetitive effect in the "market" for real estate
association services.  This deficit is also fatal to their
boycott claim.  *See Reifert*, 2005 WL 2055958, at *6 (rejecting
group boycott claim on nearly identical facts).  *See also*
*O'Riordan v. Long Island Bd. of Realtors*, 707 F. Supp. 111, 116
(E.D.N.Y. 1988) (granting summary judgment for defendants on MLS
boycott claim).[9]

Therefore, having heard the parties, and the court being
otherwise sufficiently advised,

**IT IS ORDERED** that: (1) plaintiffs' motion for summary
judgment (Doc. #31) be, and is hereby, **DENIED**; (2) defendants'
cross motion for summary judgment (Doc. #33) be, and is hereby,
**GRANTED**; and (3) defendants' motion to strike exhibits (Doc. #42)
and plaintiffs' motion to augment the record and permit briefing
(Doc. #56) be, and are hereby, **DENIED AS MOOT**.

A separate judgment shall enter concurrently herewith.

---

[9]*See also Venture Resources Group, Inc. v. Greater New
Jersey Regional Multiple Listing Service, Inc.*, No. 95-0401, 1995
WL 866841, at *2-3 (D.N.J.  Aug. 24, 1995) (rejecting Sherman Act
challenge to MLS listing and discussing valid reasons for
Realtor® board membership requirements).

This 9th day of December, 2005.

William O. Bertelsman

**WILLIAM O. BERTELSMAN, JUDGE**

tic: 55 min.